Town Motors, Inc. v. Commissioner.
Town Motors, Inc. v. Commissioner
Docket No. 2697.
United States Tax Court
1946 Tax Ct. Memo LEXIS 129; 5 T.C.M. (CCH) 625; T.C.M. (RIA) 46173; July 24, 1946
*129 Petitioner, an automobile dealer using the accrual method of accounting, sold its conditional sales contracts to a finance company under an agreement whereby the finance company retained a portion of the selling price in a loss reserve. Accumulated loss reserves in excess of 3 percent of the aggregate unpaid balance on paper purchased from petitioner were paid over to petitioner twice a year and returned by petitioner as income. Petitioner did not consider amounts remaining in the loss reserve account as income. Held, petitioner's income should be determined by accruing the amounts remaining in the loss reserve account, following Shoemaker-Nash, Inc., 41 B.T.A. 417. Raymond C. Sandler, Esq., Nathan Schwartz, Esq., 6253 Hollywood Blvd., Los Angeles 28, Calif., and Samuel Pop, C.P.A., for the petitioner. E. A. Tonjes, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: Respondent determined tax deficiencies for the fiscal years ended September 30, 1940 and 1941, as follows: Fiscal Year
Tax
Deficiency
1940
Income Tax
$1,270.75
1940
Declared value excess-
profits tax
78.54
1941
Income Tax
370.99
*130 For each fiscal year respondent increased petitioner's net income by the amounts credited to petitioner by a finance company but omitted from petitioner's returns Respondent determined that the amounts ($9,513.59 in 1940 and $5,374.36 in 1941) were taxable when credited since petitioner's returns were made on the accrual basis of accounting. Petitioner challenges this determination. Findings of Fact Petitioner is a California corporation, organized December 11, 1939, and has $8,000 of common stock issued and outstanding. It was originally organized under the name of Sunset Motors, Inc. On January 13, 1941, the corporate name was changed to Town Motors, Inc. Its principal office is at 7077 Sunset Boulevard, Los Angeles, California. It used the accrual basis of accounting and its income tax returns for the taxable years were prepared on the accrual basis. Its tax returns for the fiscal years herein were filed with the collector of internal revenue for the sixth district of California. During the taxable years petitioner was engaged in the business of buying and selling new and used automobiles. On or about January 1, 1940, petitioner took over the business of B. R. Roberts, doing *131 business as Sunset Motors, and acquired certain assets and liabilities of said business. From time to time during the fiscal periods involved petitioner sold new and used automobiles under conditional sales contracts. The contracts followed the usual form of conditional sales contracts and provided that title to the car sold was retained by the holder of the sale contract until the balance was fully paid in money. Petitioner sold and assigned its conditional sales contracts to C. I. T. Corporation, a finance company, pursuant to the terms of a "Dealer's Retail Automobile Agreement" in force and effect between petitioner and C.I.T. at all times during the fiscal periods herein involved. The dealer's assignment which appeared on the reserve side of the conditional sale contract provided as follows: DEALER'S ASSIGNMENT The Dealer whose signature appears in the acceptance of the contract on the reverse side hereof sells and assigns the said contract for value unto C.I.T. CORPORATION without recourse as to customer's obligation of payment. conferring full power to C.I.T. in its name to take all such legal or other proceedings as Dealer may take, save for this assignment. Dealer *132 warrants that; the contract is genuine; the cash payment and/or trade-in allowance were received; all statements of fact therein are true; Dealer has good title to the vehicle; the customer is not an infant and has capacity to contract; Dealer has no knowledge of any facts which impair the validity or value of said contract; certificate of title showing lien or encumbrance in favor of C.I.T. has been or will be forthwith applied for; that there are no taxes accrued and payable, including assessments under the hauling receipts tax law, against the property, which have not been satisfied. Dealer agrees that this assignment is made under and pursuant to an existing retail agreement with C.I.T. and that execution hereof shall by reference include the terms of such agreement, in the absence of which this assignment is intended, and does carry, Dealer's full guarantee of payment. Wherever Dealer fully guarantees the contract C.I.T. is expressly released from any obligations to pay accrued or unpaid taxes against the property described in the contract. C.I.T. is authorized to compound or release any rights against or grant extensions of time to customer without notice and without affecting *133 Dealer's liability hereon. Dealer agrees that in case all or part of the insurance coverage is not purchased through C.I.T., that Dealer will furnish C.I.T. with the policy securing its interest within five days of assigning the contract or repurchase the contract for the unpaid balance, and will abide by the loss settlement made under the policy and should there be a denial of liability or settlement for an amount less than the balance due C.I.T., Dealer will pay the difference between such insurance recovery and the balance open on the account. GUARANTY In consideration of the execution of the instrument on the reverse side hereof, we jointly and severally guarantee to any holder the payment when due of every instalment thereunder and the payment on demand of the entire unpaid balance if Customer defaults in payment of any installment at its due date or in any other manner, without first requiring holder to proceed against Customer. We waive notice of acceptance hereof and of default thereunder and consent that holder may, without affecting our liability, release any rights against and grant extensions of time of payment to Customers and other obligors. Witness our hands and seals.
(Seal)
(Seal)
(Seal)
*134 The Dealer's Retail Automobile Agreement hereinabove mentioned provided as follows: C.I.T. CORPORATION: Los Angeles, California, January 6, 1941. You propose to buy from us, in accordance with the plans described below, paper acceptable to you covering new and used cars, and this agreement states the basis of purchase. PLAN A: 1. Paper purchased by you under this plan will conform to the following standard requirements as to Minimum Down Payments and Maximum Terms in equal monthly instalments: New Cars 25% - 18 months, 30% - 24 months: Current and one and two year old Used Cars 30% - 18 months, three year old Used Cars 33 1/3% - 16 months, other Used Cars 33 1/3% - 12 months, and in addition, if paper covers a used car, the car will be listed in, and the cash unpaid balance will not exceed 66 2/3% of the retail value as quoted in the current issue of any generally recognized used car valuation book in use by you at time of purchase. 2. Such paper will be endorsed and assigned without recourse (meaning without guarantee of payment) and we shall have no liability, aside from warranties other than our obligation to purchase from you each repossessed or recovered car when tendered *135 at our place of business, or, if we are out of business or in default to you, tender may be made by registered mail notice to our last known business address, within three (3) months after maturity of the earliest installment still unpaid. If, however, tender is delayed by a redemption period, litigation or any existing or future law or executive proclamation, the period of delay shall be excluded in computing the three months. The purchase price shall be the unpaid balance due on the car. 3. We have no responsibility on converted or confiscated cars until repossessed or recovered and tendered as above. You will allow us the actual net cost of repairing the collision damage which results in repossession; allowance is not to exceed the unpaid balance due you, less the "as is" retail value of the car and less any holdback relating to the car. Where the retail resale value of the repaired car (without deduction for overhead and salesman's commission) exceeds the unpaid balance, the excess will be deducted from the collision allowance. PLAN B: 4. Paper not conforming to plan A standards as to down payment, terms or valuation may also be endorsed and assigned without recourse in the *136 same manner as in plan A unless such paper is specifically described in plan C. 5. Our mutual responsibilities shall be the same as in plan A except that in addition, should the car be repossessed or recovered after the three (3) months, or if the car has not been recovered (whether due to conversion, confiscation or any other reason) within three (3) months of delinquency as above, we shall pay you on demand any loss sustained by you up to the difference between the paid balance due on the car and what that balance would have been had the paper conformed to plan A requirements, and in case of collision damage your loss shall not be greater than if the paper had qualified under plan A. If paper covers a used car not listed in used car valuation book currently used by you, we shall reimburse you on demand for any deficiency on the paper after you have applied the net proceeds of the sale of the car with no allowance from you for collision repairs. Any holdback made by you may be applied in full by you to reduce the unpaid balance due on the paper. PLAN C: 6. All paper not eligible for purchase under plan A or plan B above, and paper covering commercial cars rated or described as *137 over 1 1/2 tons, commercial and other trailers, buses, cars used for taxi, livery, jitney, or "drive-yourself" service, cars sold or leased to one of our employees, salesman or household, and cars used as demonstrators, and paper upon which you expressly request and receive such endorsement before purchase from us, will bear our full recourse endorsement and/or assignment. We shall also have full recourse endorsement liability, regardless of under what plan paper is purchased, if we make any settlement with a purchaser without your written consent, disclose any provision of this agreement to the purchaser or breach any provisions of this agreement or of the assignment to you. In all cases outlined under plan C you may make any necessary correction in our endorsement and/or assignment. GENERAL: 7. On all paper bearing our full recourse endorsement or assignment we shall pay you upon your request the unpaid balance due from the purchase at any time after the paper is in default, without allowance or offset for loss occasioned by conversion, confiscation, collision or inability to tender the car. 8. Until paying you for any repossessed or recovered car we will store the car at our *138 risk and expense and as your property and will deliver it to you on demand. 9. In addition to the several protections for us outlined above, and as further protection against our share of the responsibility under this agreement, you (C.I.T.) will create a loss reserve for us, based upon the difference between the net C.I.T. charge to us and the time payment mark-up made by us. In June and December of each year, if we are not indebted to you, you will pay our accumulated reserves in excess of three per cent (3%) of the aggregate unpaid balance on paper purchased from us, and we shall pay when due any sums payable by us prior to the respective reserve payment dates. 10. If we stop selling you our paper, or you stop buying it, you may hold and apply our reserves until liquidation of all paper purchased, and all obligations due you, from us. Whenever our time payment mark-up on any car exceeds your regular published C.I.T. charge, you shall be entitled to reimbursement for any collision, conversion, confiscation and/or abandonment loss on the car to the extent of such excess and such excess may be charged to our reserve. 11. This agreement shall apply to all paper hereafter sold *139 to you and endorsed without recourse and to all paper previously sold you, irrespective of transfers between purchasers and until the paper is liquidated. No waiver or change of any provision shall be binding on you unless evidence by writing signed by one of your officers and this agreement shall inure to and bind our respective successors and assigns and any company affiliated with you which may transact business hereunder and shall be construed as a contract under the laws of the State where accepted by you. Located at: Los Angeles, Cal., 3/5/41 (signed) TOWN MOTORS, INC. (Corporate, Individual or Firm Name) C.I.T. CORPORATION, By: (signed) R. L. Hebebrand B. D. Roberts, President (Owner, Officer or Partner - State which) Whenever an automobile was sold under the conditional sales contract there was added to the balance due on the selling price, a time payment mark-up charge for financing and insurance pursuant to a schedule and rates furnished and fixed by C.I.T. Corporation. When the conditional sales contract was sold to C.I.T. Corporation under the Dealer's Retail Automobile Agreement above set forth, the petitioner executed the guaranty, also hereinabove set forth, *140 and C.I.T. Corporation paid petitioner the unpaid balance of the cash selling price of the car. Exhibit 1 shows the conditional sale of a used car by petitioner and the financing of the unpaid balance with C.I.T. Corporation under Plan B. Petitioner sold the car for a cash selling pirce of $253.35 and a time selling price of $313.75. The time payment mark-up of $60.40 consisted of $32.40 service charge and $28 for the "Dealer's Reserve". The purchaser paid $65.35 as a down payment and agreed to pay $248.40 in 12 monthly installments of $20.70 each. C.I.T. Corporation paid petitioner $188 for the conditional sales contract. C.I.T. Corporation carried on its books in petitioner's name an account known as "Dealer's Reserve" to which, as to each conditional sales contract assigned to it, it credited the excess of the time payment mark-up charge over and above its own charge for financing and insurance. The "Dealer's Reserve" was set up as a loss reserve by C.I.T. Corporation for any contingencies on the part of the dealer. In case a car was repossessed C.I.T. Corporation charged the "Dealer's Reserve" account with the amount credited thereto at the time of sale and followed substantially *141 the same procedure when it could not locate a car for repossession. Other contingencies that might prevent the dealer from geting any part of the "Dealer's Reserve" were "in the event the paper would go back" and if a dealer sold a car for cash and "did not pay the car off on his wholesale flooring." C.I.T. Corporation looked to the Dealer's Reserve to satisfy any default by petitioner on its guaranties and obligations to the finance company. On January 1, 1940, the Dealer's Reserve in favor of B. R. Roberts, doing business as Sunset Motors, and which was taken over by petitioner, was in the sum of $3,752.93. During the fiscal year ending September 30, 1940, the C.I.T. Corporation paid to petitioner the accumulated reserves in excess of 3 percent of the aggregate unpaid balance on conditional sales contracts purchased from petitioner. On September 30, 1940, there was accumulated in the Dealer's Reserve account the sum of $9,513.59. During the fiscal year ending September 30, 1941, C.I.T. Corporation paid to petitioner the accumulated reserves in excess of 3 percent of the then aggregate unpaid balance on conditional sales contracts purchased from petitioner. On September 30, 1941, the *142 accumulated reserves in the Dealer's Reserve Account were in the sum of $14,887.95. The sum of $9,513.59 accumulated in the Dealer's Reserve as of the end of the fiscal year September 30, 1940, and the net additional sum of $5,374.36 accumulated in the Dealer's Reserve during the fiscal year ending September 30, 1941, after deducting the payments made in November 1940 and May 1941, were reflected upon petitioner's books by a debit in an account entitled "Finance Company Reserves and Holdbacks" offset by a credit in an account entitled "Reserves for Repossession Losses." Petitioner's balance sheets for the fiscal period showed Finance Company Reserves and Holdbacks as an asset and Reserves for Repossession Losses as a Liability. Petitioner treated payments actually made by and received from C.I.T. Corporation during the fiscal years involved against said Dealer's Reserve account as income. During the fiscal periods involved petitioner at no time was delinquent in any payments due C.I.T. Corporation, nor was any portion of the Dealer's Reserve with-held by C.I.T. Corporation by reason of any delinquency or because of any obligation of any kind on the part of petitioner. At all *143 times material herein C.I.T. Corporation was in such sound financial condition that it was able to pay any amounts which became payable to petitioner. The amounts credited to petitioner in the Dealer's Reserve account on the finance company's books, namely, $9,513.59 in 1940 and $5,374.36 in 1941, represented income to the petitioner for the respective taxable periods. Opinion Petitioner contends that the amounts in question are not accruable as income for the fiscal years for the reason that (1) the right to receive such sums was contingent, with the possibility that all or a substantial portion thereof might never be received, and (2) there was no agreement by C.I.T. Corporation to pay petitioner the said sums because they were not in excess of three per centum of the aggregate unpaid balance of the outstanding conditional sales contracts. Petitioner relies upon , and a memorandum decision of the Board of Tax Appeals. The respondent's theory of petitioner's tax liability is based primarily upon our decision in , and a memorandum opinion of the Board *144 to the same effect. Respondent points out that petitioner here seeks to deduct from gross income a reserve for repossession losses on automobiles. He contends that if petitioner is entitled to a reserve for losses sustained because of failure by purchasers to carry out their contracts, the reserve should be calculated upon the basis of petitioner's experience and not upon an amount withheld by C.I.T. Corporation. The Shoemaker-Nash case, supra, like the present case, involved a contract with C.I.T. Corporation. It also involved a contract with another finance company. A comparison of those contracts with the one before us discloses that many of the provisions of the contracts are the same. In deciding that the reserve credits there involved were accruable items of income, we stated in part as follows: From the above it is, in our opinion, apparent that the sale of notes of automobile purchasers to the finance companies was as much a part of the business carried on by the petitioner as the sale of the automobiles themselves, * * * and, the petitioner being on the accrual basis, we find nothing in this case to justify the conclusion that the profit from the sale of such notes is *145 not accruable when the notes are sold. Spring City Foundry Co. v. Commissioner, supra; . For, although the amount of the reserve credit is not immediately paid and does not become immediately payable, there is no showing that it will not be collectible when due or that its collection in the future is improbable. The decision in , and other cases of similar import discussed by the petitioner in its brief, are not applicable here. * * * The Shoemaker-Nash case was distinguished by the Third Circuit in its Keasbey & Mattison Co. case upon the ground, inter alia, that the so-called reserve was really not a reserve against possible losses. The Court stated that "the 'reserve' was in reality nothing more than a plan by the finance companies to provide for payment to the taxpayer's (automobile dealers) of a portion of the purchase price of the notes." Other distinctions between the two cases were pointed out by the Circuit Court which need not be repeated here. Upon authority of the Shoemaker-Nash case, we affirm the determination of the respondent. Decision will be entered for the *146 respondent.